**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MEAGAN L. ASHBY,<br><br>               Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>             Defendant. | CASE NO. 1:22-CV-01368-AMK<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**<u>MEMORANDUM OPINION AND ORDER</u>** |

Plaintiff Meagan Ashby ("Plaintiff" or "Ms. Ashby") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF Doc. 8.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I.        Procedural History

Ms. Ashby filed her DIB and SSI applications on September 26, 2019, alleging a disability onset date of August 2, 2018. (Tr. 90, 91, 93, 189, 194.) She asserted disability due to schizoaffective disorder-bipolar type, post-traumatic stress disorder, dyslexia, social anxiety, arthritis and hip issues. (Tr. 230.) Ms. Ashby's application was denied at the initial level (Tr. 112-114) and upon reconsideration (Tr. 120-128). She then requested a hearing. (Tr. 129-31.)

1

A telephonic hearing was held before an Administrative Law Judge ("ALJ") on April 27, 2021. (Tr. 34.) The ALJ issued an unfavorable opinion on July 6, 2021. (Tr. 12.) Ms. Ashby requested review of the decision by the Appeals Council (Tr. 186-88) which was denied on May 31, 2022, making the ALJ's decision the final decision of the Commissioner (Tr. 1-6). Ms. Ashby filed her Complaint seeking judicial review on August 3, 2023. (ECF Doc. 1.) The case is fully briefed and ripe for review. (ECF Doc. 7, 9, 11, 12.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Ms. Ashby was born in 1988 and was 30 years old when she filed for DIB and SSI benefits, making her a younger individual under Social Security regulations. (Tr. 93.) She completed her high school education in 2006. (Tr. 231.) She worked as an amusement park ride attendant in 2006. (Tr. 49.) Between 2008 and 2018, she also worked as a dog groomer, cashier, night cleaner, pick-up service, and storefront stocker. (Tr. 110.) Ms. Ashby has not worked since August 1, 2018, the alleged onset date. (Tr. 230.)

### B.      Medical Evidence

Although the ALJ identified physical and mental impairments (Tr. 18), Ms. Ashby brings her appeal based solely on the ALJ's decision as it relates to her mental impairments (ECF Doc. 9). The evidence summarized herein is therefore focused on Ms. Ashby's mental impairments.

#### 1.      Relevant Treatment History

Ms. Ashby sought treatment for depression and anxiety at the Nord Center in March 2019. (Tr. 501.) The Nord Center recommended individual counseling, medication management, supportive employment, day treatment, and linking to medical insurance. (Tr. 510, 515.) Ms. Ashby received psychiatric medication management services from Richelle Jenkins,

MSN, APRN, PMHNP-BC (Tr. 501, 519-522), individual counseling from Edie Henthorne, LSW (Tr. 574), and case management services—Therapeutic Behavioral Service or TBS—from Alesha Swopes, QMHS, and others (Tr. 550-73).  She was engaged in treatment at the Nord Center before and after her alleged disability onset date.  (Tr.  523-37.)

At her initial intake session on March 19, 2019, Ms. Ashby exhibited average eye contact and clear speech.  (Tr. 507.)  Her thought processes were logical, she displayed an anxious, depressed mood with full affect, and she was restless but cooperative.  (Tr. 508.)  No impairment in cognition was observed and Ms. Ashby was oriented to time, place, person, and occasion.  (Tr. 508.)  She was estimated to be of average intelligence, and had fair insight and judgment.  (Tr. 508.)  No psychosis was reported or observed.  (Tr. 508.)  Asked to identify employment concerns or issues, Ms. Ashby said she would like to work with animals, had issues with anxiety and depression which negatively impacted employment, and felt anxious meeting new people and in groups of people.  (Tr. 512.)

After establishing care at the Nord Center, Ms. Ashby had about twenty medication management appointments with NP Jenkins between March 2019 and February 2021, averaging one visit per month.  (Tr. 519-552.)  Ms. Ashby's appointments occasionally increased in frequency when her symptoms became more acute and decreased in frequency when she stabilized; throughout this time, she generally did not go more than two months without being seen by NP Jenkins.  (*Id.*)

At Ms. Ashby's initial psychiatric evaluation on March 27, 2019, NP Jenkins confirmed diagnoses for: post-traumatic stress disorder; major depressive disorder, severe, recurrent; and alcohol use disorder, severe.  (Tr. 519-522.)  NP Jenkins made a note to rule out diagnoses of schizoaffective disorder versus major depressive disorder with psychotic features.  (Tr. 519.)

3

The mental status examination showed racing thought process, anxious mood and affect, poor memory, and fair insight/judgment and fund of knowledge.  (Tr. 520.)  At a follow-up examination with NP Jenkins on April 17, Ms. Ashby's thought processes were concrete, but she was focused and alert, did not have abnormal thoughts, and was oriented with intact associations.  (Tr. 523, 524.)  She was anxious and her memory, insight, and judgment were poor.  (Tr. 524.)

Ms. Ashby's medication regimen underwent several iterations during the first months of treatment.  NP Jenkins prescribed prazosin and Lexapro on March 29 (Tr. 521), then modified her medication plan on April 17 by tapering Ms. Ashby off Lexapro and adding Seroquel and Zoloft (Tr. 524-25).   Six days later, on April 24, Ms. Ashby reported that her mood was better and she had less agitation when taking Seroquel (Tr. 527).  She had been "doing stuff and wanting to get out of the house."  (Tr. 527.)  On examination, Plaintiff was well groomed, had logical thought processes, and displayed expressive and clear language.  (Tr. 527.)  NP Jenkins confirmed Ms. Ashby's diagnosis for schizoaffective disorder, bipolar type, during this visit.  (Tr. 527.)  In a session on May 25, Ms. Ashby asserted that that Seroquel was now ineffective; therefore, NP Jenkins stopped Seroquel, introduced Latuda, and increased both Zoloft and prazosin.  (Tr. 531-32.)

Ms. Ashby also began psychotherapy with Edie Henthorne LSW and had 13 visits between April 2019 and August 2019.  (Tr. 574-99.)  During these appointments, LSW Henthorne often observed an anxious mood with full affect (Tr. 576, 584, 586, 588, 590, 592, 594, 598), but her mood was occasionally more depressed with a constricted affect (Tr. 574), or she was mildly depressed and anxious mood with constricted affect (Tr. 578, 580, 582).  On a few occasions, LSW Henthorne observed that Ms. Ashby's leg bounced, and she rocked her body back and forth in the chair.  (Tr. 574, 576, 586, 588.)  Ms. Ashby reported auditory and

visual hallucinations at times, as well as recurrent thoughts about being a burden.  (Tr. 578, 580, 582, 590.)  During a counseling session at Nord Center on June 19, 2019, Plaintiff stated that she was looking for a part-time job and wanted to work with animals.  (Tr. 512.)  She indicated she had issues with anxiety that contributed to her quitting jobs in the past, and wanted a low-stress job where she did not interact with others.  (*Id*.)

At a July 2019 appointment with NP Jenkins, Plaintiff reported that her sleep was good, her mood was stable, and she felt happier.  (Tr. 534.)  Her anxiety was "better at times" and her social anxiety was "more controlled."  (*Id*.)  She was alert and oriented, her insight and judgment were good, and her mood was euthymic.  (Tr. 535.)  Similar mental status examination findings were recorded at a September 2019 follow-up examination, including a euthymic mood and full affect.  (Tr. 539.)

In addition to medication management and psychotherapy, Ms. Ashby also began working with TBS on issues such as Medicaid, housing, employment services and food benefits. She had six TBS appointments between April 2019 and July 2019. Her case manager noted that she was anxious, irritable, and restless.  (Tr. 550-61.)  Ms. Ashby began supported employment services in June 2019 for help in finding and obtaining a part-time job.  (Tr. 512.)

On August 31, 2019, Ms. Ashby was taken to the emergency room and was hospitalized for five days after a suicide attempt by overdosing on pills and alcohol.  (Tr. 315-53, 538.)  On admission, she reported she did not feel like living any more.  (Tr. 315.)  She was discharged four days later, on September 19, with her treating physician noting upon discharge that "[patient was] observed visible and social on unity with bright and reactive affect. She denies [suicidal ideation] and she has not complained of anxiety.  [Patient was] observed to sleep through night [and] states that she feel ready to be home. . . ."  (Tr. 343.)

NP Jenkins saw Ms. Ashby during six appointments between September 2019 and

November 2019.  (Tr. 538-49, 600-07, 625-28, 835-38.)  In September, Ms. Ashby reported

feeling irritable and on edge, despite stopping Zoloft and adding 10 mg Lexapro after her August

hospital stay.  (Tr. 538.)  To address Ms. Ashby's irritability, NP Jenkins added low dose Invega.

(*Id.*)  A month later, she reported low energy and occasionally sleeping as much as 14 hours a

day even though she slept 8-10 hours most nights.  (Tr. 542.)  Because of reported adverse side

effects such as irritability, lethargy, and weight gain, NP Jenkins decided to wean Ms. Ashby off

Latuda and increase Lexapro.  (Tr. 542.)  In October 2019, Plaintiff described decreased

irritability, attributed to the addition of Invega.  (Tr. 546.)  Her mood was euthymic and she had

a full affect, but she was anxious (Tr. 547).  In November 2019, Ms. Ashby reported feeling

more depressed with daily crying spells and occasional hallucinations.  (Tr. 625.)  Mental status

examinations during this time included anxious mood but fair memory, insight/judgment, and

fund of knowledge.  (Tr. 539, 543, 546, 626.)

Ms. Ashby also had seven TBS appointments between September 2019 and November

2019.  (Tr. 562-73.)  Her case manager again observed that she was anxious, irritable, and

restless.  (Tr. 562-73, 821.)

When NP Jenkins saw Ms. Ashby on December 4, 2019, she reported that her sleep was

disturbed.  (Tr. 621.)  NP Jenkins noted paranoid thought content and anxious mood. (Tr. 621-

22.)  She added hydroxyzine HCL to Ms. Ashby's medications, increased the prazosin, and

continued Lexapro and Invega.  (Tr. 622-23.)

On December 19, 2019, Ms. Ashby reported to NP Jenkins that she had gone to the ER

for a panic attack and was prescribed Wellbutrin and Xanax.[1]  (Tr. 618.)  Mental status

---

[1] Neither party had identified medical records related to this ER visit.  (*See* ECF Doc. No 9, p. 8 n.2.)

examination findings included anxious mood, constricted affect, and fair memory, insight, and judgment.  (Tr. 619.)  NP Jenkins increased Invega, discontinued Lexapro, and prescribed Klonopin.  (Tr. 618.)  The following day, on December 20, 2019, Ms. Ashby sought treatment in the emergency room for her anxiety.  (Tr. 630-71.)  She was diagnosed with anxiety and social anxiety disorder, treated with lorazepam (Ativan), and discharged home.  (Tr. 632, 653, 659.)

In follow up with NP Jenkins on December 26, 2019, Ms. Ashby reported that the ER did not do anything for her and Klonopin had not helped.  (Tr. 614.)  She reported feeling agitated and having increased crying spells, in addition to sleep and appetite issues.  (Tr. 614.)  Mental status examination again showed fair memory and fair insight/judgment.  (Tr. 615.)  NP Jenkins prescribed Melatonin for sleep, added propranolol, and continued the Invega.  (Tr. 615-16.)

Ms. Ashby also had three therapy sessions in December 2019.  (Tr. 839-44.)  LSW Henthorne continued to note Ms. Ashby's anxious mood, constricted affect, and rocking back and forth.  (Tr. 839, 841.)  During her three TBS appointments in December 2019, the case manager observed that Ms. Ashby was anxious, restless, and manic.  (Tr. 823-28.)

Ms. Ashby had two appointments with NP Jenkins in January 2020.  (Tr. 610-13, 809-12.)  She reported she had weaned herself off Invega due to the side effects and asked to restart Latuda because she felt it was more effective.  (Tr. 610.)  She had increasing thoughts about being trapped or in a fire, was not sleeping well, and had a poor appetite.  (*Id*.)  Mental status findings noted an anxious, constrictive affect, but were otherwise unchanged.  (Tr. 611.)  NP Jenkins adjusted medications, including adding Latuda and trazodone.  (Tr. 611-13.)  Three weeks later, Ms. Ashby reported she was sad and had crying spells and low motivation.  (Tr. 809.)  Mental status findings were unchanged.  (Tr. 809-10.)  NP Jenkins started Effexor XR and adjusted other medications.  (Tr. 810-12.)

7

Ms. Ashby returned to the emergency department on January 2, 2020.  (Tr. 687-692.)
Her primary complaints were that she "[hadn't] been able to eat or sleep [and had] been having
tremors as well."  (Tr. 687.)  The clinical impression was drug reaction.  (Tr. 691.)  She was
discharged the same day.  (Tr. 692.)

LSW Henthorne saw Ms. Ashby for seven therapy sessions in January and February
2020.  (Tr. 845-52, 928-33.)  Ms. Ashby continued to show irritable or anxious moods.  (Tr. 845,
847, 849, 930, 932.)  At times she had a depressed mood with flat or constricted affect.  (Tr.
928.)  On one occasion she reported racing thoughts.  (Tr. 851.)  At times, Ms. Ashby reported
paranoid thoughts and struggled with restructuring those thoughts.  (Tr. 845, 847.)  LSW
Henthorne observed her rocking her body on at least one occasion.  (Tr. 932.)

Ms. Ashby had four TBS appointments in January and February 2020, where her case
manager observed that she was anxious, restless, and had a flat affect. (Tr. 829-32, 894-97.)

NP Jenkins saw Ms. Ashby once in March 2020 and once in June 2020.  (Tr. 869, 873.)
In March, Ms. Ashby reported improved depression, anxiety and sleep.  NP Jenkins continued
the same course of medication.  (Tr. 866-69.)  By June, however, Ms. Ashby was feeling worse,
having vivid dreams, trouble sleeping, and panic attacks before her work shifts.  (Tr. 870).  NP
Jenkins increased Prazosin and continued the other medications: buspirone, propranolol,
trazodone, Effexor XR, and Latuda.  (Tr. 870-73.)

Between March 2020 and June 2020, Ms. Ashby had ten therapy appointments with LSW
Henthorne.  (Tr. 934-53.)  She reported some increased anxiety over working in a grocery store
during the pandemic.  (Tr. 934, 936, 940, 942.)  LSW Henthorne noted in each record that Ms.
Ashby exhibited an anxious mood, but was clear, oriented, and cooperative. (*See e.g., id.*)  On
May 6, Ms. Ashby reported having a "great" week and improved ability to process anxiety while

at work.  (Tr. 944.)  Ms. Ashby consistently reported a rating of "some progress," but

occasionally rated "good progress," after her sessions with LSW Henthorne.  (*See e.g.*, Tr. 934,

936 ("good"), 939, 940.)

Ms. Ashby also had six TBS appointments between March 2020 and June 2020.  (Tr.

898-909.)  Her case worker continued to observe that she was depressed, anxious, and irritable.

(*Id.*)  Supported employment continued in Ms. Ashby's service plan after she was let go from her

part-time job at Save-A-Lot in June 2020 due to attendance issues.  (Tr. 860.)

NP Jenkins saw Ms. Ashby twice in August 2020.  (Tr. 875, 879.)  She reported

increased symptoms.  (Tr. 875.)  NP Jenkins increased Latuda and Effexor XR and continued all

other medications.  (Tr. 875-76; 879.)

Ms. Ashby had eight therapy sessions between July 2020 and August 2020.  (Tr. 954-69.)

She reported that she was fired from her job, but that she could work with supported employment

to assist her in finding a new job.  (Tr. 958.)  LSW Henthorne observed that Ms. Ashby's mood

was predominantly anxious (Tr. 954, 960, 962, 964) and that she also exhibited a depressed

mood on three occasions (Tr. 956, 958, 968).

During her four TBS sessions in July and August 2020, Ms. Ashby's case worker noted

that she was anxious, restless, and irritable, and that she was fidgeting and had difficulty sitting

still.  (Tr. 910-17.)

Ms. Ashby had five TBS appointments between September 2020 and December 2020.

(Tr. 918-27.)  Her case manager again noted that she was anxious, irritable, depressed, and

restless, but also that she was cooperative, logical, and oriented.  (*Id.*)

NP Jenkins had three more appointments with Ms. Ashby between October 2020 and

February 2021.  (Tr. 882-93.)  In October, Ms. Ashby reported her sleep was worse, as well as

increased irritability, anger, and anxiety at work, but that home was a safe space.  (Tr. 882.)  NP Jenkins increased trazodone.  (Tr. 883-84.)  In December, Ms. Ashby's symptoms had improved.  (Tr. 866.)  She was no longer employed though she was "actively looking for work," and hoping to work with animals.  (*Id*.)  By February, her symptoms—including anxiety, depression, and energy level—had again worsened.  (Tr. 891-92.)  NP Jenkins increased Effexor XR and continued other medications.  (*Id*.)

Ms. Ashby attended eleven therapy sessions between September 2020 and January 2021.  (Tr. 970-91.)  In October and November, Ms. Ashby reported increased anxiety at work, eventually compelling her to leave that job.  (Tr. 976, 978.)  In November, she reported that she chose to leave work due to conflict, anxiety, and depression symptoms.  (Tr. 978.)  LSW Henthorne noted depressed, anxious mood, and maladaptive communication, high reactivity, and active hallucinations.  (Tr. 970-88.)  In January 2021, LSW Henthorne noted that Ms. Ashby was reporting mild symptoms and that she "seemed to gain insight into mild symptoms due to less life stressors and maintain routine at home."  (Tr. 990.)

### 2.     Function Report

In a February 2020 function report, Ms. Ashby reported that anxiety prevented her from obtaining a full-time job.  (Tr. 248.)  She alleged that she experienced panic attacks twice a day despite being compliant with her medications.  (Tr. 248.)  Ms. Ashby also stated that she saw "shadows" once a day, which contributed to paranoia and made her feel unsafe.  (Tr. 248.)  She said she stayed in the house most days, except when she had appointments.  (Tr. 249.)  She cooked and cleaned daily, sometimes crocheted or read, and spent most of her time watching television.  (*Id*.)  Ms. Ashby alleged that her impairments caused difficulties in the following areas of mental functioning: memory; concentration; understanding; following instructions; and

getting along with others. (Tr. 253.) She said that she followed written instructions well but had difficulty remembering verbal instructions. (*Id*.) She explained that she got along "pretty well" with authority figures, such as bosses, and she had never been fired or laid off from a job because of problems getting along with other people. (*Id*.)

### 3. Opinion Evidence

#### i. Opinion of Plaintiff's Medical Provider

In an opinion letter dated August 31, 2020, NP Jenkins stated:

> Meagan Ashby has been a patient at the Nord Center since February 2019. Meagan has a diagnosis of Schizoaffective Disorder, Bipolar type. She can experience poor moods (suicidal ideation, difficulty with hygiene, hypersomnia, isolating) as well as elevated moods (impulsive, irritable, insomnia). She has a history of panic attacks which are triggered in social situations. They can impair her ability to remember and follow directions. She is able to maintain attention and concentration in a limited capacity due to anxiety and racing thoughts. She is easily overwhelmed by everyday tasks and increased stress causes panic attacks. She has shown an ability to follow directions and work when independence away from others is granted. She is able to keep a regular schedule and be punctual. This can be affected by abrupt change to schedule as client can have some hesitance adapting to change.

(Tr. 853.)

#### ii. State Agency Mental Health Reviewers

The state agency psychological consultant at the initial level of administrative review, Aracelis Rivera, Psy.D., submitted a Mental Residual Functional Capacity ("RFC") assessment on November 29, 2019. (Tr. 73-75, 85-87.) Dr. Rivera opined that Plaintiff could: understand, remember, and perform one to three step tasks that do not entail a fast pace; interact superficially; and adapt to routine changes in routine without difficulty. (Tr. 75, 87.) Under the Psychiatric Review Technique (PRT), Dr. Rivera also opined that Ms. Ashby had moderate limitations all four categories of mental functioning: understanding, remembering, or applying

information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (Tr. 69-70, 81-82.)

On February 12, 2020, Janet Souder, Psy.D., the state agency psychological consultant at the reconsideration level, adopted the same PRT findings as Dr. Rivera.  (Tr. 95-96, 105-106.) Dr. Souder also adopted Dr. Rivera's mental RFC limitations, finding "the initial assessment remains largely consistent and supported by the objective evidence in file with no more than minor changes to narrative."  (Tr. 100, 110.)  Her notes regarding Ms. Ashby's limitations in sustained concentration and persistence include the following notations: "due to depression, PTSD" and "Focused during [office visit]s, pace and persistence reasonably impacted when symptoms exacerbate."  (Tr. 99, 109.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the telephonic hearing in April 2021, Ms. Ashby testified regarding her daily routine and activities.  (Tr. 43-44.)  She stated that she lives with her boyfriend, does household chores while her boyfriend is at work, and practices meditation to calm herself down when she gets distracted.  (Tr. 43.)  She told the ALJ that she does not interact with people other than her boyfriend on a regular basis: "I usually isolate myself. I usually stay in the house and I mostly just interact with

my boyfriend. My mom will call me on the phone sometimes, but not all the time."  (Tr. 44)

Ms. Ashby testified that she worked 18 hours a week as a cashier at Save-A-Lot the year before.  (Tr. 44.)  She stopped working there after four months because "[she] was seeing shadows and having panic attacks."  Tr. 45.  She then worked at Miller's Super Valu part time in 2020 for about two months.  (Tr. 45.)  She left the job because of panic attacks and crying at

work.  (*Id.*)  Also in 2020, Ms. Ashby worked at Dollar General but the job ended when other employees "were making fun of [her] . . . and [she] stared having a panic attack and [her] depression kicked in and [she] couldn't stay at the store."  (Tr. 51)

Earlier jobs included about seven years working part time for an animal hospital, caring for and cleaning up after the animals.  (Tr. 46-47.)  She left this job because of "[her] anxiety and depression."  (Tr. 47.)  And Ms. Ashby worked for Dollar Tree in 2014 for about two years.  (Tr. 48.)  The job ended when other employees made fun of her.  (Tr. 51.)  She explained: "I started having a panic attack and my depression kicked in and I couldn't stay at the store. I had to leave."  (*Id.*)  Ms. Ashby's also worked in a summer-long position at Cedar Point amusement park in 2006.  (Tr. 49.)  She was a ride attendant who "helped little kids onto their little rides and made sure that they were buckled up."  (*Id.*)

Ms. Ashby reported having panic attacks about every other day, even though she was not working.  (Tr. 51.)  She said they were brought on by visual and auditory hallucinations, describing "shadows" and "sounds like a music box."  (Tr. 52.)  She also described "horrible dreams," "paranoia . . . [about] what's going to happen to [her] because of her dreams," and "missed work because of [her] depression."  (Tr. 53.)  She also said her dyslexia affected her mental functioning, asserting that she "didn't learn to read until [she] was in middle school." (Tr. 54.)  She has a driver's license and drove about twice a week.  (Tr. 57.)

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Ms. Ashby's age, education, and work experience, with the functional limitations described in the RFC, could not perform Ms. Ashby's prior work, but could perform representative positions in the national economy, including cleaner, housekeeper, cafeteria attendant, and garment folder.  (Tr. 60.)  He

also testified that it would preclude competitive employment if the person would either be off

task 20% of the workday or absent more than two days per month.  (Tr. 62.)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments

depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The statute

states, in pertinent part:

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy. . . .

*Id*.

To make a determination of disability under this definition, an ALJ is required to follow a

five-step sequential analysis set out in agency regulations, summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must
       be severe before he can be found to be disabled.

3.     If the claimant is not doing substantial gainful activity, is suffering from a
       severe impairment that has lasted or is expected to last for a continuous
       period of at least twelve months, and his impairment meets or equals a listed
       impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must
       assess the claimant's residual functional capacity and use it to determine if
       the claimant's impairment prevents him from doing past relevant work.  If
       the claimant's impairment does not prevent him from doing his past relevant
       work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.      The ALJ's Decision

In his September 1, 2020 decision, the ALJ made the following findings:[2]

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2023.  (Tr. 17.)

2.      The claimant has not engaged in substantial gainful activity since August 1, 2018, the alleged onset date.  (*Id.*)

3.      The claimant has the following severe impairments: obesity, post-traumatic stress disorder, schizoaffective disorder (bipolar type), and alcohol use disorder.  (Tr. 18)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18-19.)

5.      The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: the claimant can frequently use ramps and stairs, but can never use ladders, ropes or scaffolds. She can frequently balance and occasionally kneel, stoop, crouch and crawl. She is limited to a static work environment - tolerating few changes in a routine work setting and when said changes do occur, any changes in job duties would need to be explained. She is limited to simple tasks and limited to routine and repetitive tasks. She is limited to occasional interaction with a small group of co-workers where the contact

---

[2] The ALJ's findings are summarized.

is casual in nature. She is limited to superficial interaction with the public – "superficial" means if a member of the public were to approach and ask directions to the nearest restroom, she would be able to provide such information, but that would be the extent of the interaction. She is limited to work that does not involve any work tasks that require arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others. She can have no interaction with the public. (Tr. 20.)

6.    The claimant is unable to perform any past relevant work. (Tr. 27.)

7.    The claimant was born in 1988 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (Tr. 28.)

8.    The claimant has at least a high school education. (*Id*.)

9.    Transferability of job skills is not material to the determination of disability. (*Id*.)

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including cleaner housekeeping, cafeteria worker and garment folder. (Tr. 20-21.)

Based on the foregoing, the ALJ determined that Plaintiff was not under a disability, as defined in the Social Security Act, from August 1, 2018, through the date of the decision on July 6, 2021. (Tr. 21.)

## V.    Plaintiff's Arguments

Ms. Ashby presents the following arguments for this Court's review:

1.    The ALJ erred in finding the opinion of the treating nurse practitioner persuasive while ignoring significant limitations included in that opinion.

2.    The ALJ erred in finding the opinions of the state agency psychological consultants somewhat persuasive, while providing no rationale for excluding a limitation on pace, despite finding moderate limitations in pace.

(ECF Doc. 9, pp. 1, 17, 21.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  Furthermore, a decision will not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    First Assignment of Error: Whether ALJ Erred in Assessing Ms. Ashby's Mental RFC After Finding Treating Source Opinion of NP Jenkins Persuasive**

In her first assignment of error, Ms. Ashby argues that the ALJ erred because he omitted certain limitations in NP Jenkins' August 2020 opinion letter from the RFC, despite finding the opinion "persuasive."  (ECF Doc. 9, pp. 17-21.) The Commissioner responds that the ALJ adequately incorporated the limitations from NP Jenkins' opinion into the RFC, converting vague limitations into concrete and vocationally relevant terms.  (ECF Doc. 11, pp.  11-16.)

Based on his evaluation of the evidence in the record (Tr. 20-27), the ALJ determined Ms. Ashby's mental RFC to be as follows:

> She is limited to a static work environment - tolerating few changes in a routine work setting and when said changes do occur, any changes in job duties would need to be explained. She is limited to <u>simple tasks and limited to routine and repetitive tasks</u>. She is limited to <u>occasional interaction with a small group of co-workers where the contact is casual in nature</u>. She is limited to superficial interaction with the public – "superficial" means if a member of the public were to approach and ask directions to the nearest restroom, she would be able to provide such

information, but that would be the extent of the interaction. She is limited to work that does not involve any work tasks that require arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others. She can have no interaction with the public.

(Tr. 20 (emphasis added).)  The evidence he considered in assessing the RFC included a letter from NP Jenkins, which stated the following:

> [Ms. Ashby] can experience poor moods (suicidal ideation, difficulty with hygiene, hypersomnia, isolating) as well as elevated moods (impulsive, irritable, insomnia). She has a history of panic attacks which are triggered in social situations. They can impair her ability to remember and follow directions.  She is able to maintain attention and concentration in a limited capacity due to anxiety and racing thoughts. She is easily overwhelmed by everyday tasks and increased stress causes panic attacks. She has shown an ability to follow directions and work when independence away from others is granted. She is able to keep a regular schedule and be punctual. This can be affected by abrupt change to schedule as client can have some hesitance adapting to change.

(Tr. 853 (emphasis added).)  In assessing the persuasiveness of this letter, the ALJ explained:

> Ms. Jenkins-Garrett's input and medical opinion are persuasive because she supported it with explanations and her own observations. Furthermore, her medical opinion is generally persuasive because it is consistent with the mental status examinations of the claimant by Ms. Jenkins-Garrett since May 20, 2019 showing the claimant's mood at times was depressed and/or anxious, but the claimant's thought processes were consistently logical, her attention/concentration was consistently alert, her memory was fair or good, her fund of knowledge was fair, and her insight/judgment was fair or good []. As reflected in the claimant's mental residual functional capacity as set forth above, Ms. Jenkins-Garrett's concerns are contemplated in the mental residual functional capacity.

(Tr. 23-24 (citations omitted) (emphasis added).)

Ms. Ashby now argues that the concerns outlined in NP Jenkins' letter "are not fully contemplated in the [RFC] in two ways."  (ECF Doc. 9, p. 18.)  First, she notes that the RFC allows for "occasional interaction with a small group of co-workers where the contact is casual in nature," and argues this limitation conflicts with NP Jenkins' opinion "that Ms. Ashby could work independently, *away from others*."  (*Id.* (emphasis in brief).)  Second, she notes that the RFC indicates she can perform simple, routine, and repetitive tasks, and argues that this conflicts

with NP Jenkins' finding that "everyday tasks" overwhelm her and cause panic attacks.  (*Id.*)
Ms. Ashby further argues that the "significant" nature of her treatment at the Nord Center was
downplayed by the ALJ in assessing the RFC.  (*Id.* at p. 19.)  Each argument is addressed below.

### 1.      Framework for Evaluating the RFC and Medical Opinion Evidence

An ALJ must determine a claimant's RFC based on all the relevant evidence in the
record.  *See* 20 C.F.R. §§ 404.1545(a)(1); 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 F.
App'x 149, 157 (6th Cir. 2009).  That includes medical opinion evidence.  Nevertheless, an ALJ
"is not required to recite the medical opinion of a physician verbatim in [her] residual functional
capacity finding."  *Poe*, 342 F. App'x at 157.  Indeed, as the Sixth Circuit explains, "requir[ing]
[an] ALJ to base [his] RFC finding on a physician's opinion, would, in effect, confer upon the
treating source the authority to make the determination or decision about whether an individual is
under a disability, and thus would be an abdication of the Commissioner's statutory
responsibility to determine whether an individual is disabled."  *Rudd v. Comm'r of Soc. Sec.*, 531
F. App'x 719, 728 (6th Cir. 2013) (internal quotation and citation omitted).

The Social Security Administration's ("SSA") regulations for evaluating medical opinion
evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors
listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones
v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).
The five factors to be considered are supportability, consistency, relationship with the claimant,
specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors
are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must
explain how they considered consistency and supportability, but need not explain how they
considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

**2.      Whether ALJ Erred in Finding Ms. Ashby is Able to Perform Work
Requiring Occasional Casual Interaction with a Small Group of Coworkers**

Ms. Ashby argues first that the ALJ failed to account for NP Jenkins' finding that Ms.

Ashby "has shown an ability to follow directions and work when independence away from others

is granted" (Tr. 853) when he found her capable of "occasional interaction with a small group of

co-workers where the contact is casual in nature" (Tr. 20).  (ECF Doc. 9, p. 18.)  This argument

lacks merit.  NP Jenkins' observation that Ms. Ashby can follow directions and work when

"away from others" is not the same as a finding that she *cannot* also work in a job where she will

need to have casual contact with a small group of coworkers up to one-third of the workday.

SSR 96-8p sets forth the policies and policy interpretations regarding the assessment of

RFCs and explains that an "RFC is not the *least* an individual can do despite his or her

limitations or restrictions, but the *most*."  SSR 96-8p, 61 Fed. Reg. 34474, 34474-75 (July 2,

1996) (emphasis in original).  This is consistent with the regulations, which establish that an

RFC "is the most [a claimant] can still do despite [her] limitations."  20 C.F.R. § 416.945(a)(1).

Although NP Jenkins' letter indicates that Ms. Ashby can follow directions and work when she is

away from others, it does not state that she can *only* work when she is away from others.  Thus,

Ms. Ashby's argument that the ALJ failed to explain a conflict between NP Jenkins' opinion and

the RFC on this issue lacks merit.

Ms. Ashby's additional argument that the ALJ failed to build an accurate and logical

bridge between the evidence and the result must also fail.  In assessing the persuasiveness of NP

Jenkins' opinion and the RFC in general, the ALJ cited to Ms. Ashby's mental status findings

since May 2019, noting that she continued to demonstrate logical thought processes, alert

attention and concentration, fair or good memory, fair fund of knowledge, and fair or good

insight and judgment *despite* her depressed and/or anxious mood.  (Tr. 24, 25.)  He also detailed

21

her reports to her therapist regarding difficulties she experienced with various part-time jobs, and concluded:

> The undersigned finds the claimant is motivated to work and although it appears that her Save-A-Lot job ended due to attendance issues caused by transportation issues, the evidence clearly shows the claimant has difficulties with others, particularly coping with "rude" customers. However, the mental residual functional capacity as set forth above contemplates the issues and jobs were found by the vocational expert.

(Tr. 26.)  In keeping with this explanation, the ALJ adopted an RFC limiting Ms. Ashby to occasional, casual contact with a small group of co-workers and superficial contact with the public, with no work tasks involving arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others.  (Tr. 20.)  In this context, the Court finds the ALJ adequately explained the social interaction limitations adopted in the RFC and built an adequate and logical bridge between the evidence and the result.

### 3.     Whether ALJ Erred in Finding Ms. Ashby is Able to Perform Simple, Routine, Repetitive Tasks

Ms. Ashby argues next that the ALJ failed to account for NP Jenkins' finding that Ms. Ashby "is easily overwhelmed by everyday tasks and increased stress causes panic attacks" (Tr. 853) when he found her "limited to simple tasks and . . . routine and repetitive tasks" (Tr. 20). (ECF Doc. 9, p. 18.)  The Commissioner responds that the relevant statement is "arguably not even an opinion, . . . because it is not a 'statement . . . about what [Plaintiff] can still do despite [her] impairments.'"  (ECF Doc. 11, p. 15 (quoting 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2)).)  The Commissioner also argues that the ALJ did not err by failing to incorporate, or explain the omission of, NP Jenkins' finding that Ms. Ashby is "easily overwhelmed by everyday tasks" in the RFC because "it is not clear what this [statement] means in terms of Plaintiff's ability to perform basic mental work activities."  (*Id.* at p. 15.)

"A medical opinion is a statement from a medical source about what [Plaintiff] can still do despite [her] impairment(s) and whether [she] ha[s] one or more impairment-related limitations or restrictions in" her ability to perform, e.g., "the mental demands of work activities." 20 C.F.R. § 416.913(a)(2)(i)(B). While NP Jenkins' assertion that Ms. Ashby "is easily overwhelmed by everyday tasks" and suffers panic attacks (Tr. 853) is *not* a statement about what she "can still do," it does describe "impairment-related limitations or restrictions" in her ability to meet the mental demands of work activities. 20 C.F.R. § 416.913(a)(2). Thus, the Court finds the statement in question is appropriately characterized as a medical opinion.

Nevertheless, it does make a difference to the analysis that the opinion generally identifies impairment-related limitations without specifying what Ms. Ashby remains able to do. Although the limitations described by NP Jenkins would presumably impact Ms. Ashby's ability to work, the opinion does not clearly specify the extent to which, or the circumstances in which, she would remain able to perform work activities. While Ms. Ashby asserts that simple, routine, repetitive tasks could not be performed by a person with the described limitations—being easily overwhelmed by everyday tasks and suffering panic attacks—she does not offer further explanation or evidence to support this assertion. (ECF Doc. 9, pp. 18-21.)

A review of the plain language of NP Jenkins' opinion does not clearly demonstrate that a person with the limitations described by NP Jenkins would necessarily be unable to perform simple, routine, repetitive tasks. This is particularly true given the additional limitations imposed by the mental RFC, including limitations to a static work environment with limited interactions with others. In this context, Ms. Ashby's argument that the ALJ failed to explain a conflict between the opinion and the RFC restriction to simple, routine, repetitive tasks must fail.

Ms. Ashby's further argument that the ALJ failed to build an accurate and logical bridge between the evidence and the result must also fail.  Here, the ALJ acknowledged Ms. Ashby's subjective complaints (Tr. 20), provided a detailed discussion of the medical records (Tr. 21-26), outlined his basis for concluding that the treatment records were more consistent with the RFC than the subjective complaints (Tr. 25-26), and assessed the persuasiveness of the other medical opinion evidence (Tr. 26-27).  In support of the RFC, the ALJ explained:

> The undersigned finds that the mental status examinations and course of treatment in this case are not consistent with disabling mental impairment and are more consistent with the stated residual functional capacity. As recounted above, the claimant started to treat on March 27, 2019 with Ms. Jenkins for medication management. Significantly, on examinations of the claimant by Ms. Jenkins since May 20, 2019, the claimant's mood was depressed and/or anxious at times, but her thought processes were consistently "logical," there was only one instance of abnormal thought content of hallucinations and one instance of paranoia, her attention/concentration was consistently "alert," her memory was fair or good, her fund of knowledge was consistently fair, and her insight/judgment was fair or good []. The nurse practitioners at Lorain County Health & Dentistry consistently documented that the claimant's mood and affect were "appropriate" []. During the relevant timeframe, the claimant was psychiatrically hospitalized from August 31, 2019 to September 4, 2019, but not again. While the claimant has received outpatient mental health services though Nord on a regular basis, the claimant has not required or received frequent or intensive outpatient mental health services. In December 2019 and September 2020, the claimant said her visual hallucinations did not cause her distress []. From all of this, the undersigned finds that the claimant's symptoms and limitations are not as severe as alleged.

(Tr. 25 (citations omitted).)  In assessing the medical opinions of the state agency psychological consultants—who found Ms. Ashby was capable of performing 1-3 step tasks—the ALJ found the opinions to be somewhat persuasive and generally supported by NP Jenkins' mental status examination findings.  (Tr. 27.)  In the context of all of these findings, the Court cannot find that the ALJ failed to build a logical bridge between the evidence and his finding that Ms. Ashby can perform simple, routine, repetitive tasks in the work environment described in the RFC.

Ms. Ashby's argument that the ALJ downplayed the frequency of her mental health services (ECF Doc. 9, p. 19) does not change this analysis.  Ms. Ashby notes that she attended 21

medication management sessions between March 2019 and February 2021, as well as 59 therapy

sessions and 40 case management sessions.  (*Id.*)  She acknowledges that the ALJ described

some appointments with NP Jenkins in the decision, but argues that his decision otherwise

"makes only a passing reference to other services at the Nord Center.  (*Id.*)  She then highlights

the ALJ's observation that "[w]hile the claimant has received outpatient mental health services

though Nord on a regular basis, the claimant has not required or received frequent or intensive

outpatient mental health services," (*id.* (quoting Tr. 25)), and argues that this finding amounts to

"downplaying the frequency of services" (*id.*).

A review of the ALJ decision reveals that he provided a detailed discussion of eleven

medication management visits with NP Jenkins, dating between March 2019 and February 2021,

and a thorough discussion of her August 2020 opinion letter.  (Tr. 21-24.)  He also outlined Ms.

Ashby's March 2019 intake with the Nord Center, where she sought individual counseling and

medication management services, and where the intake worker recommended medication

management, individual counseling, and supportive employment.  (Tr. 21.)  The ALJ described

her August 2019 hospitalization, where she reported ongoing treatment at the Nord Center.  (Tr.

22.)  He also provided a lengthy discussion of matters Ms. Ashby discussed with her therapist at

sixteen therapy sessions, dating between December 2019 and February 2021.  (Tr. 25-26.)

This Circuit has long held that an ALJ need not discuss every piece of evidence to render

a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F.

App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–

08 (6th Cir. 2006) (per curiam)).  Ms. Ashby has not identified specific findings or observations

from other treatment visits that she contends the ALJ failed to discuss or account for in the RFC.

Instead, she suggests that the ALJ has generally downplayed the nature and frequency of her

treatment visits at the Nord Center.  (ECF Doc. 9, p. 19.)  The Court disagrees.  The ALJ clearly acknowledged that Ms. Ashby received medication management and psychotherapy services "on a regular basis" over a period of years at the Nord Center.  (Tr. 21-25.)  His further observation that she "has not required or received frequent or intensive outpatient mental health services" (Tr. 25) does not undermine this acknowledgement.  The meaning of the term "frequent" is subject to interpretation and Ms. Ashby has not identified any medical records suggesting that she engaged in "intensive" outpatient mental health treatment, like an intensive outpatient program ("IOP"), during the relevant period.

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  While Ms. Ashby disagrees with the ALJ's evaluation of NP Jenkins' opinion and the treatment records, the Court finds that the ALJ's determination of the RFC in light of NP Jenkins' opinion was properly based on the entire the record, and clearly articulated specific reasons for the persuasiveness and RFC findings which were consistent with and supported by the evidence.  *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess. . . .").

For the reasons set forth above, the Court finds that the ALJ's analysis of the RFC in light of NP Jenkins' medical opinion was supported by substantial evidence and built an adequate and logical bridge between the evidence and the result.  Accordingly, the Court finds the first assignment of error to be without merit.

C.     **Second Assignment of Error: Whether ALJ Erred in Assessing Ms. Ashby's Mental RFC After Finding State Agency Psychiatric Opinions Somewhat Persuasive**

In her second assignment of error, Ms. Ashby argues that the ALJ erred when he omitted the state agency psychological consultants' limitation to "1 to 3 step tasks *that do not entail a fast pace*" from the RFC, despite finding those opinions "somewhat persuasive" and assessing moderate limitations in persistence and pace.  (ECF Doc. 9, pp. 21-22 (emphasis added).)  The Commissioner responds that this argument is a red herring because the ALJ found the opinions only "somewhat persuasive" and specifically stated that he did not adopt a limitation precluding tasks entailing a fast pace.  (ECF Doc. 11, p. 17.)

In assessing the persuasiveness of the state agency psychological consultants' opinions, the ALJ held as follows:

> Aracelis Rivera, PsyD, and Janet Souder, PsyD, reviewed the claimant's case file at the request of the State agency, the Division of Disability Determination Services, on November 29, 2019 and February 12, 2020, respectively. Both consultants expressed the following medical findings: the claimant can understand, remember, and perform 1 to 3 step tasks that do not entail a fast pace. Interpersonally, the claimant can interact superficially. She can adapt to routine changes in routine without difficulty (1A, 2A, 6A, and 8A).
>
> Their medical findings are <u>somewhat persuasive</u> because they are generally supported by the mental status examinations of the claimant by Ms. Jenkins, as recounted above. However, <u>instead of performing 1 to 3 step tasks that do not entail a fast pace, the undersigned limits the claimant to simple, routine, and repetitive tasks in a static work environment</u>. In addition, consistent with the evidence outlined above, the undersigned imposes more restrictive social interaction limitations. As such, the undersigned limits the claimant as follows: to only occasional interaction with a small group of co-workers where the contact is casual in nature; to work that does not involve any work tasks that require arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others; and no interaction with the public.

(Tr. 27 (emphasis added).)

As discussed above, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding."  *Poe*, 342 F. App'x at 157.  Indeed, even

where an opinion was given great weight under the prior regulations, the Sixth Circuit noted that "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x 267, 275 (6th Cir. 2015).  Here, the ALJ explicitly specified that he was not adopting the "fast pace" limitation proposed by the state agency psychological consultants, and found their opinions only "somewhat persuasive."  The ALJ was not required to preclude "fast pace" jobs, and explicitly did not do so.

Ms. Ashby nevertheless argues that the ALJ failed to "adequately account for [Ms. Ashby's] deficits in pace and persistence" when he did not include the state agency consultants' "fast pace" limitation in the RFC, despite finding at Step Two of the sequential evaluation that Ms. Ashby had "moderate limitations" in the ability to concentrate, persist, and maintain pace. (ECF Doc. 9, p. 22.)  In further support of this argument, she contends that the Sixth Circuit held in *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), that "a limitation to simple repetitive work failed to address the assessment of the State agency reviewing physicians who noted problems in concentration and persistence."  (ECF Doc. 9, p. 22.)

The *Ealy* decision is perhaps best known for holding: "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."  *Ealy*, 594 F.3d at 516.  The district court in *Ealy* had held that a hypothetical question "fairly incorporated" a state agency consultant's RFC assessment even though the ALJ left out the consultant's limitation to tasks "where speed was not critical."  *Id.* at 512, 516.  In those circumstances, the Sixth Circuit held at Step Five of the

sequential analysis that the claimant's limitations "were not fully conveyed to the vocational expert" because the consultant's pace limitations were left out of the hypothetical.  *Id.* at 516-17.

As to Ms. Ashby's claim that *Ealy* establishes that a limitation to simple repetitive work *cannot* account for moderate limitations in persistence and pace, the Sixth Circuit has since clarified that "[c]ase law in this Circuit does not support a rule that a hypothetical providing for simple, unskilled work is *per se* insufficient to convey moderate limitations in concentration, persistence and pace." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 635 (6th Cir. 2016); *see also Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014) (finding a "limitation to simple, routine, and repetitive tasks adequately convey[ed] [a claimant]'s moderately-limited ability 'to maintain attention and concentration for extended periods'").

Here, the ALJ adopted an RFC providing that Ms. Ashby can only work in an environment where all of the following limitations are applied: a static work environment, as defined; simple, routine, repetitive tasks; no more than occasional, casual interaction with a small group of coworkers; no more than superficial interaction with members of the public, as defined; and no work tasks requiring arbitration, negotiation, confrontation, responsibility for the safety or others, or directing others.  (Tr. 20.)  Ms. Ashby's summary assertion that this combination of limitations "does not adequately account for" her moderate limitations in persistence and pace falls short of her burden to show that the RFC lacked the support of substantial evidence.

For the reasons set forth above, the Court finds that the ALJ's analysis of the RFC in light of the state agency psychological consultants' medical opinions was supported by substantial evidence and built an adequate and logical bridge between the evidence and the result. Accordingly, the Court finds the second assignment of error to be without merit.

## VII.    Conclusion

For the foregoing reasons, the Court AFFIRMS the Commissioner's decision.

March 12, 2024

/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge